# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Rosalind J. G., | Case No. 18-cv-82 (TNL) |
| Plaintiff, | |
| v. | **ORDER** |
| Nancy Berryhill,<br>Acting Commissioner of the Social<br>Security Administration, | |
| Defendant. | |

Mac Schneider, Schneider Schneider & Schneider, 815 Third Avenue South, Fargo, ND 58103 (for Plaintiff); and

Bahram Samie, Assistant United States Attorney, United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415; and Michael Moss, Special Assistant United States Attorney, Social Security Administration, Office of the General Counsel, Region VI, 1301 Young Street, Suite A702, Dallas, TX 75202 (for Defendant).

## I. INTRODUCTION

Plaintiff Rosalind J. G. brings the present case, contesting Defendant Commissioner of Social Security's denial of her applications for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.*, and supplemental security income ("SSI") under Title XVI of the same, 42 U.S.C. § 1381 *et seq.* The parties have consented to a final judgment from the undersigned United States Magistrate Judge in accordance with 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, and D. Minn. LR 72.1(c).

This matter is before the Court on the parties' cross-motions for summary judgment. (ECF Nos. 13, 15.) Being duly advised of all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Plaintiff's motion for summary judgment (ECF No. 13) is **DENIED** and the Commissioner's motion for summary judgment (ECF No. 15) is **GRANTED**.

## II. PROCEDURAL HISTORY

Plaintiff applied for DIB and SSI asserting that she has been disabled since September 2014 due to "[s]pinal cord compression with distortion and displacement," "arthritis of cervical spine c5-c6," "2 large broad based disc protrusions," "major depression," "anxiety," "bipolar disorder," "concentration," "moderate-severe disc space narrowing at c5-c6," "possible schizophrenia," and "L4-L5 disc space narrowing and dif[f]use disc signal loss." (Tr. 12, 65-66, 75-76; *see* Tr. 87-88, 98-99.) Plaintiff's applications were denied initially and again upon reconsideration. (Tr. 12, 74, 84-86, 97, 108-10.) Plaintiff appealed the reconsideration of her DIB and SSI determinations by requesting a hearing before an administrative law judge ("ALJ"). (Tr. 12, 129-30.)

The ALJ held a hearing in August 2016. (Tr. 12, 32, 34.) After receiving an unfavorable decision from the ALJ, Plaintiff requested review from the Appeals Council, which denied her request for review. (Tr. 1-3, 10-31, 186.) Plaintiff then filed the instant action, challenging the ALJ's decision. (Compl., ECF No. 1.) The parties have filed cross motions for summary judgment. (ECF Nos. 13, 15.) This matter is now fully briefed and ready for a determination on the papers.

### III. MEDICAL RECORDS

Plaintiff has a history of chronic neck pain. (Tr. 403.) At an unrelated medical appointment in June 2014, it was noted that "[t]here has been a problem with chronic pain syndrome as well." (Tr. 396.) At the same time, it was also noted that "[c]urrently, she is really doing quite well indeed." (Tr. 396.)

### A. Records Related to Chronic Pain

#### 1. 2014

In early September 2014, Plaintiff was seen by Pankaj Timsina, MD, for neck pain, among other things. (Tr. 394.) Upon examination, Plaintiff's neck was supple but she had tenderness "on her right neck and across her trapezius." (Tr. 394.) Dr. Timsina noted that this was "a chronic issue" for Plaintiff and that she had "been taking tramadol"[1] for it. (Tr. 394.) Dr. Timsina ordered x-rays of Plaintiff's cervical spine, prescribed Flexeril[2], and referred Plaintiff "to physical therapy for myofascial release." (Tr. 394; *see* Tr. 424-25.)

Approximately two weeks later, Plaintiff was seen for an unrelated condition by Monika Pokharel, MD, in internal medicine. (Tr. 392.) When "asked if she [wa]s having any neck pain or any weakness in any of the arms or any shortness of breath," Plaintiff said "no," but also stated that "[s]he has been having, since childhood, the neck pain on and off and she has been used to this pain and does not do anything" for it. (Tr. 392.)

---

[1] "Tramadol is used to relieve moderate to moderately severe pain. . . . Tramadol is in a class of medications called opiate (narcotic) analgesics. It works by changing the way the brain and nervous system respond to pain." *Tramadol*, MedlinePlus, U.S. Nat'l Library of Medicine, https://medlineplus.gov/druginfo/meds/a695011.html (last visited Mar. 4, 2019).

[2] Flexeril is a brand name for cyclobenzaprine, a medication "used with rest, physical therapy, and other measures to relax muscles and relieve pain and discomfort caused by strains, sprains, and other muscle injuries." *Cyclobenzaprine*, MedlinePlus, U.S. Nat'l Library of Medicine, https://medlineplus.gov/druginfo/meds/a682514.html (last visited Mar. 4, 2019).

Plaintiff had full strength in all of her extremities. (Tr. 392.) Later, when Dr. Pokharel explained that an MRI of her neck showed "advanced arthritis and like[ly] cord impingement at C5-C6," Plaintiff requested something for the pain, including narcotic medications. (Tr. 392; *see* Tr. 420-22.) Dr. Pokharel referred Plaintiff to neurosurgery and discussed physical therapy "in detail." (Tr. 392-93.) Plaintiff was also given a limited supply of medication, "30 tablets" to be "use[d] on an as-needed basis."[3] (Tr. 393.)

The following day, Plaintiff had a consultation with Abdul A. Baker, MD, in neurosurgery. (Tr. 390, 353, 457.) Plaintiff presented

> with over a 20-year history of neck pain that has progressively worsened, especially with her job as an embroiderer that is a repetitive job with her neck in a flexed posture, that has resulted in multiple episodes of bilateral upper extremity, right worse than left weakness, numbness and tingling, with episodes of dropping objects in the past.

(Tr. 391; *accord* Tr. 353, 457.) Plaintiff reported "that medicines like Aleve and tramadol, Flexeril help her symptoms, but repetitive activity seems to worsen her symptoms." (Tr. 391; *accord* Tr. 353, 457.) Plaintiff had not tried physical therapy or epidural steroid injections. (Tr. 391, 353, 457.)

Dr. Baker noted that an "MRI of the cervical spine shows spinal cord compression at C5-C6 with neuroforaminal stenosis at that level, and also neuroforaminal stenosis at C6-C7 with no evidence of spinal cord compression at that site . . . ." (Tr. 391; *accord* Tr. 353, 457; *see* Tr. 420-22; *see also* Tr. 658-661.) Plaintiff also had "other multilevel degenerative changes, but primarily the cord compression is clearly seen at C5-C6 with no

---

[3] It is not clear from office note what medication was prescribed.

evidence of intrinsic cord signal change." (Tr. 391; *accord* Tr. 353, 457; *see* Tr. 420-22.) There was "no clear evidence of motor or sensory abnormality on physical examination, and no evidence of myelopathy." (Tr. 391; *accord* Tr. 353, 457.) Dr. Baker recommended that Plaintiff undergo physical therapy and an epidural steroid injection. (Tr. 391, 353, 457.)

The day after she met with Dr. Baker, Plaintiff returned to Dr. Pokharel to discuss the results of her neck MRI. (Tr. 386.) Dr. Pokharel noted that Plaintiff did "not have any weakness in any parts of the body"; "denie[d] any bowl or bladder problems"; and "review of systems [was] negative for all other systems." (Tr. 386.) Plaintiff asked if Dr. Pokharel can "provide her disability." (Tr. 386.) Dr. Pokharel discussed with Plaintiff that she would need to bring in certain forms, but offered to provide her with a letter "that as per the request of the patient that she is doing physical therapy and she is the main person of the house to provide food to 2 kids and herself so provide something saying that she would not be able to go to work every day," and that "she would be able to work only less hours a day." (Tr. 386.) Plaintiff responded "that she did not know how that works and she wants money . . . for every hour that she is not working also, and she wants to work some hours, not full hours like 40 hours a week." (Tr. 386.)

The same day, Plaintiff began physical therapy. (Tr. 388.) During her initial visit, Plaintiff reported "a history of neck pain over the last 3 to 4 years with progressive worsening." (Tr. 388.) Plaintiff "note[d] some right upper extremity weakness more recently, but also note[d a] history of right epicondylitis several years ago, which improved following episodes of therapy." (Tr. 388.) Plaintiff's "neck pain [wa]s worse with stress,

sitting . . . [for more than 30 to 60 minutes], standing for prolonged periods, lifting/carrying, and with reaching higher and lower." (Tr. 388.) Plaintiff described her pain "as tight and note[d] that it feels like her neck is locking up." (Tr. 388.) Plaintiff's pain was "better with heat and medications." (Tr. 388.)

Upon examination, Plaintiff had "decreased cervical range of motion, decreased upper extremity strength and poor posture." (Tr. 389.) Plaintiff was "noted to guard neck upon assessment . . . , with limited active range of motion with mobility, along with guarded posture." (Tr. 389.)

Three days later, Plaintiff met with Shivan Kulasingham, MD, in internal medicine, wanting to discuss the status of the x-rays ordered by Dr. Timsina. (Tr. 383.) Plaintiff was also "not happy" following her appointment with Dr. Pokharel. (Tr. 383.) Dr. Kulasingham noted that Plaintiff was currently undergoing physical therapy. (Tr. 384.) Dr. Kulasingham recommended getting "an opinion from physical medicine rehab to see whether they recommend doing an EMG to see if there is any upper extremity abnormality seen on [the] EMG." (Tr. 384.) Dr. Kulasingham also refilled Plaintiff's tramadol prescription, had "her sign a pain contract," and "filled out FMLA forms so that she can go to physical therapy and her physical medicine appointment." (Tr. 385.)

At her physical therapy appointment the same day, Plaintiff reported that she was "feeling better today," and that her medications were helping with her pain and also helping her relax. (Tr. 384.) Plaintiff rated her pain at a 6 out of 10. (Tr. 385.) The therapist noted that Plaintiff had "decreased pain and tightness" at the end of the session and demonstrated improved movement. (Tr. 385.) Plaintiff also had "decreased guarding and tightness."

(Tr. 385.)  Similar observations were made during Plaintiff's next two sessions.  (Tr. 381-82.)  During one session, Plaintiff reported that "she feels that it has been more difficult to thread the needle with her right hand and has had to grip harder so she does not drop the thread."  (Tr. 382.)

In mid-October, Plaintiff had a cervical epidural steroid injection to address her neck pain.  (Tr. 377.)  Plaintiff's "[c]ervical spine exam [wa]s positive only for some relatively mild paraspinal muscle tenderness on the right side more so than left in the lower cervical region."  (Tr. 377.)  In preparation for the injection, "Chronic pain syndrome (10/03/2014)" was listed in Plaintiff's past medical history.  (Tr. 379.)

That same day, after the injection, Plaintiff returned to Dr. Kulasingham.  (Tr. 376.)  Dr. Kulasingham noted:

> I have seen her once for back pain.  She has several providers here already, including Dr. Timsina and Dr. Pokh[a]rel, and she has seen Dr. Baker in neurosurgery.  When I saw her last week I said that if we were going to restrict her work activity or anything I would like at least a reconsult from Physical Medicine, but she returns after just two therapy treatments saying now her low back hurts.  She is walking different.  She has been using Flexeril at night and using a heating pad.  She found that to be helpful, but does not think she can go back to work today.  Reviewing her case, I will give her off for 4 days until Friday.  I am still awaiting physical med consultation.

(Tr. 376.)

Approximately one week later, Plaintiff followed up with Dr. Baker.  (Tr. 374, 351, 455.)  Dr. Baker noted that Plaintiff had some weakness in her left upper extremity.  (Tr. 375 ("Bilateral upper extremity strength is 5/5 with the exception of left wrist extensor and bilateral triceps were 4+/5."), 351 (same), 455 (same).)  Dr. Baker ordered an MRI of

Plaintiff's lumbar spine, noting afterwards "we can discuss specifics of the treatment of the spinal cord compression, which will probably be 2 level anterior cervical discectomy and fusion at C5-C6, C6-C7." (Tr. 375; *accord* Tr. 351, 455; *see also* Tr. 658-62.)

The same day, Plaintiff also saw Dr. Timsina. (Tr. 373.) Plaintiff reported that she "has not been able to work at all" and has "been going to Workers Comp." (Tr. 373.) Plaintiff was also "wondering about restrictions." (Tr. 373.) Plaintiff had new complaints of headaches and back pain as well as "some numbness and tingling in both arms and also in her legs." (Tr. 373.) Plaintiff had "tenderness over the posterior neck muscles." (Tr. 374.) Plaintiff's mood and affect was "very anxious." (Tr. 374.)

Dr. Timsina noted that Plaintiff "has already seen Dr. Baker twice, and he has discussed with her about the plan that will include medications and shots, and if not surgery, which he would not consider right away." (Tr. 374.) Dr. Timsina prescribe gabapentin[4] and "pulse therapy." (Tr. 374.) Dr. Timsina theorized that Plaintiff's headaches and back pain were "from tenderness of her neck muscles." (Tr. 374.) Dr. Timsina provided "written restrictions for not working for 2 weeks until she gets her MRI and more results." (Tr. 374.)

During her physical therapy appointment a couple of days later, Plaintiff reported having more headaches and numbness in her left arm following the injection. (Tr. 372.) Plaintiff's back also "went out." (Tr. 372.) Plaintiff also reported that "the [g]abapentin has helped a lot . . . [and she] is no longer symptomatic, notes decreased pain, headaches,

[4] Gabapentin is used to treat, among other things, "the pain of postherpetic neuralgia ( . . . the burning, stabbing pain or aches that may last for months or years after an attack of shingles)." *Gabapentin*, MedlinePlus, U.S. Nat'l Library of Medicine, https://medlineplus.gov/druginfo/meds/a694007 html (last visited Mar. 4, 2019).

stiffness, and denies any numbness." (Tr. 372.) Plaintiff "note[d] a 40% improvement overall with neck pain." (Tr. 372.)

Plaintiff continued to report headaches during her next three sessions, but also noted improvement during the latter two sessions. (Tr. 368, 370-71, 517-18.) Plaintiff's neck pain was noted to be improving during each session. (Tr. 368, 370-71, 517-18.) Plaintiff did have some lower back pain. (Tr. 368, 370, 517.) Plaintiff reported that she was "taking it easy at home beyond the essential tasks that she needs to complete to avoid aggravation." (Tr. 371; *accord* Tr. 370, 368, 517.) Plaintiff reported being able to wash dishes, cook, and do laundry "without aggravation of pain," but "[a]void[ed] heavy lifting including laundry and groceries." (Tr. 369; *accord* Tr. 517.) The therapist "[c]ontinue[d] to note tension along [Plaintiff's] right cervical musculature." (Tr. 371; *accord* Tr. 369-70, 517-18.)

At the beginning of November, Plaintiff had a consultation with Bangalore Vijayalakshmi, MD, in physical medicine. (Tr. 362, 344, 486.) Plaintiff reported that her neck "symptoms have gotten progressively worse" over the last five years. (Tr. 363; *accord* Tr. 345, 487.) Plaintiff's work as an embroiderer "involves repetitive position of her neck in flexion," and, as a result of this repetitive action, she has had "progressively worsening neck pain, along with bilateral upper limb symptoms of pain, paresthesias, weakness, and tingling numbness." (Tr. 363; *accord* Tr. 345, 487; *see* Tr. 348, 366, 490.) Plaintiff "report[ed] constant aching discomfort in her posterior neck, which she rate[d] as 6 to 7 out of 10." (Tr. 363; *accord* Tr. 345, 487.) Plaintiff's symptoms were "[a]ggravated by standing, sitting too long, lifting, [and] repetitively looking down . . . ." (Tr. 363; *accord*

Tr. 345, 487.)  They improved with "rest, medication, [and] massage."  (Tr. 363; *accord* Tr. 345, 487.)  Among other medical conditions, Dr. Vijayalakshmi noted a history of "[c]hronic neck pain." (Tr. 365; *accord* Tr. 347, 488.)  Dr. Vijayalakshmi also noted that Plaintiff was pursuing a workers' compensation claim.  (Tr. 344-45, 349-50, 362-63, 367, 486-87, 491-92.)

During the physical examination, Dr. Vijayalakshmi observed that Plaintiff had "functional strength in [her] bilateral upper limbs, with the exception of subtle collapsing weakness in [the] bilateral deltoids, 4+ to 5-/5." (Tr. 366; *accord* Tr. 348, 490.) Plaintiff's gait was normal.  (Tr. 348, 366, 490.)  Plaintiff's posture was "forward head positioning" with "[r]ounded, protracted shoulder girdles."  (Tr. 366; *accord* Tr. 348, 490.)  Plaintiff was "tender to palpation in [her] bilateral upper trapezius, splenius cervicis, [and] splenius capitis"; in her "bilateral SI joints, iliolumbar ligaments, [and] lumbar paraspinal muscles"; and "over [her] cervical paraspinal muscles."  (Tr. 366; *accord* Tr. 348, 490.)  Range of motion of Plaintiff's cervical spine "cause[d] discomfort in forward bending, backward bending, [and] side-to-side bending." (Tr. 366; *accord* Tr. 348, 490.)  Range of motion in her thoracolumbar spine similarly "cause[d] discomfort in forward bending, [and] backward bending." (Tr. 366; *accord* Tr. 348, 490.)  Dr. Vijayalakshmi also noted that Plaintiff had "[m]usculotendinous imbalances – tight, overactive, restricted in upper trapezius, sternocleidomastoid, levator scapulae, scalenes, [and] pectoral girdles," as well as "[p]seudoparetic, inhibited, and deconditioned in deep cervical flexors and rhomboids." (Tr. 366; *accord* Tr. 348, 490.)

Among other things, Dr. Vijayalakshmi diagnosed Plaintiff with "Cervical cord compression with neural foraminal stenosis at C5-C6 and cervical radiculopathy"; "Myofascial pain and dysfunction syndrome"; "SI joint dysfunction"; "Cervicothoracic musculoligamentous sprain/strain"; and "Lumbosacral musculoligamentous sprain/strain." (Tr. 367.) Dr. Vijayalakshmi recommended that Plaintiff remain "off work until she sees neurosurgery." (Tr. 368; *accord* Tr. 350, 492.)

A couple of days later, Plaintiff reported during physical therapy that she felt her headaches and range of motion in her neck were better overall, but she continued to experience neck stiffness. (Tr. 361, 515.) Plaintiff "denie[d] any numbness or tingling." (Tr. 361; *accord* Tr. 515.) Plaintiff continued to have "tension along [her] right cervical musculature, but [it was] decreased from previous sessions." (Tr. 361; *accord* Tr. 515.)

Plaintiff followed up with Dr. Timsina around the middle of November to discuss the results of a lumbar MRI. (Tr. 360; *see* Tr. 412-16, 529-32, 512-13.) The lumbar MRI showed "mild disk bulging," for which Dr. Timsina did not feel surgery was necessary. (Tr. 360; *accord* Tr. 512, *see* Tr. 412-16, 529-32.) Dr. Timsina encouraged Plaintiff to continue seeing Dr. Baker with regards to the "significant arthritis with disk disease" in her neck. (Tr. 360; *accord* Tr. 512-13.)

Towards the end of November, Plaintiff met with Crystal Knutson, PA-C, in neurosurgery primarily to discuss questions regarding surgery on her neck. (Tr. 453, 484.) Plaintiff "continue[d] to experience severe neck pain, [and] right greater than left upper extremity pain associated with numbness and tingling in both arms, primarily into the 4th and 5th digits." (Tr. 453; *accord* Tr. 484.) Plaintiff reported that physical therapy, traction,

and an epidural steroid injection did not help.  (Tr. 453, 484.)  Plaintiff rated her neck pain at a 7 out of 10.  (Tr. 453, 484.)

Upon examination, Plaintiff's "[b]ilateral upper extremity strength [wa]s 5/5 with the exception of the left wrist extensor and bilateral triceps 4+/5."  (Tr. 453-54; *accord* Tr. 484.)  Knutson listed Plaintiff's diagnoses as "C5-C6 and C6-C7 cervical spondylosis with cord compression and upper extremity radiculopathy, refractory to conservative measures," and "[l]umbar degenerative disk disease."  (Tr. 454; *accord* Tr. 485.)  With regards to Plaintiff's lumbar spine, Plaintiff "ha[d] no neurologic deficit and [her] pain [wa]s not consistent with L4-L5 degenerative disk disease."  (Tr. 454; *accord* Tr. 485.)  Knutson noted that Plaintiff wanted to proceed with cervical spine surgery with Dr. Baker.  (Tr. 454, 485; *see* Tr. 450, 481.)

### 2.  2015

In mid-January 2015, Plaintiff underwent an anterior cervical discectomy and fusion surgery with Dr. Baker to address C5-C6 and C6-C7 cervical spondylosis with cord compression and radiculopathy.  (Tr. 446, 477; *see* Tr. 442-44, 473-75.)  Following the surgery, Plaintiff's arm pain improved.  (Tr. 438, 469.)  The pain in Plaintiff's neck "changed in character and [she] described it as surgical pain."  (Tr. 438; *accord* Tr. 469.)  Plaintiff had full strength, and was discharged the following day.  (Tr. 436, 438, 469, 467.)

Plaintiff followed up with Knutson approximately one month after her surgery.  (Tr. 463.)  Plaintiff reported "significant improvement in her neck pain and headaches" as well as "in her arm symptoms."  (Tr. 463.)  Plaintiff "no longer ha[d] arm pain, numbness, or tingling," and "[h]er arms fe[lt] lighter and stronger."  (Tr. 463.)  Knutson noted that

Plaintiff's incision had "healed well" and she was "able to stand and walk with normal posture and stride." (Tr. 463.) Plaintiff had full strength and her "[s]ensation [wa]s grossly intact." (Tr. 463.) Knutson described Plaintiff as having "complete resolution of neck pain, headaches, and upper extremity symptoms." (Tr. 463.)

Approximately one month later, in the middle of March, Plaintiff saw Dr. Timsina for continued complaints of neck pain. (Tr. 503.) Plaintiff's pain was "worse on a cold, gloomy day." (Tr. 503.) Plaintiff was "taking tramadol, oxycodone[5], and also hydrocodone[6]." (Tr. 503.) Plaintiff took oxycodone when her pain was more severe and hydrocodone when her pain was mild. (Tr. 503.) Plaintiff reported having "a hard time getting up from the chair when she wakes up in the morning and this makes her pain worse." (Tr. 503.) Plaintiff's headaches were gone along with the pressure on the side of her neck. (Tr. 503.) There was "[n]o numbness or tingling." (Tr. 503.)

Dr. Timsina noted that Plaintiff was "in mild distress." (Tr. 503.) Dr. Timsina felt that Plaintiff's pain was "coming from muscle spasm and muscle tension." (Tr. 503.) Dr. Timsina had "an extensive talk with [Plaintiff] regarding cutting back on her medications." (Tr. 503.) Dr. Timsina directed Plaintiff to follow up with neurosurgery regarding her

---

[5] "Oxycodone is used to relieve moderate to severe pain. . . . Oxycodone is in a class of medications called opiate (narcotic) analgesics. It works by changing the way the brain and nervous system respond to pain." *Oxycodone*, MedlinePlus, U.S. Nat'l Library of Medicine, https://medlineplus.gov/druginfo/meds/a682132 html (last visited Mar. 4, 2019).

[6] "Hydrocodone is used to relieve severe pain. Hydrocodone is only used to treat people who are expected to need medication to relieve severe pain around-the-clock for a long time and who cannot be treated with other medications or treatments." *Hydrocodone*, MedlinePlus, U.S. Nat'l Library of Medicine, https://medlineplus.gov/druginfo/meds/a614045 html (last visited Mar. 4, 2019). Like oxycodone, hydrocodone is an opiate analgesic, and "works by changing the way the brain and nervous system respond to pain." *Id.* Hydrocodone is available in combination with other medications, including acetaminophen. *Hydrocodone Combination Products*, MedlinePlus, U.S. Nat'l Library of Medicine, https://medlineplus.gov/druginfo/meds/a601006.html (last visited Mar. 4, 2019).

continued pain, and also to inquire whether she could begin physical therapy, including myofascial release. (Tr. 503-04.)

Plaintiff saw Dr. Timsina again approximately three weeks later for a medication check. (Tr. 501.) Plaintiff was "trying to cut back on her pills, without much relief in her symptoms." (Tr. 501.) Plaintiff had "days where neck pain will definitely make her feel hurt." (Tr. 501.) Plaintiff had "more muscle tenderness in her neck" and spasms on occasion. (Tr. 501.) Plaintiff was again "in mild distress." (Tr. 501.) Upon examination, Dr. Timsina noted "some tenderness over her neck muscles" and "some tightening." (Tr. 501.)

Dr. Timsina did "not know why [Plaintiff] is still having a lot of pain," and noted that Plaintiff had an upcoming appointment with neurosurgery. (Tr. 501.) Dr. Timsina "told [Plaintiff] clearly that pain management has to be done by [the] pain clinic and not by me because of the chronicness [sic] of her pain." (Tr. 501.) Dr. Timsina added Flexeril in the interim. (Tr. 501.)

Plaintiff followed up with Knutson a few days later. (Tr. 461.) Plaintiff's arm symptoms remained resolved, but Plaintiff was having trouble with "neck stiffness and [wa]s struggling to get off narcotics." (Tr. 461.) Overall, Plaintiff "fe[lt] happy with her surgery." (Tr. 461.) Plaintiff rated her neck pain at a 7 out of 10. (Tr. 461.) Plaintiff continued to be "able to stand and walk with normal posture and stride" and had full strength. (Tr. 461.) Plaintiff's range of motion in her neck was "limited, but painless." (Tr. 461.) Knutson noted that Plaintiff was "doing well" following surgery, but also

included a diagnosis of "[c]hronic pain." (Tr. 461.) Knutson recommended that Plaintiff

engage in "[p]hysical therapy for gentle neck stretches and strengthening." (Tr. 461.)

In mid-April, Plaintiff consulted with the Center for Pain Medicine in Fargo, North

Dakota, for her neck pain based on a referral from Dr. Timsina. (Tr. 558.) Plaintiff

reported that "[m]ornings are always difficult" and she is having trouble sleeping. (Tr.

558.) Plaintiff's pain "varied throughout the day." (Tr. 558.) Plaintiff's pain was

aggravated by raising and using her arms as well as lifting. (Tr. 558.) Plaintiff's pain

improved with "medication, getting outside, walking around the block, sunshine, [and]

warm weather." (Tr. 558.) It was noted that Plaintiff had "recently stopped taking

oxycodone," and transitioned to hydrocodone. (Tr. 558.) Plaintiff was also taking

tramadol and Flexeril. (Tr. 558.)

Upon examination, Plaintiff had "[a]bnormal – muscle tightness in shoulders/neck"

and [t]enderness with palpation of Sacroiliac joints." (Tr. 560.) Plaintiff had full strength

in her upper extremities and equal range of motion in each. (Tr. 560.)

Plaintiff was diagnosed with facet joint arthropathy and sacroiliac joint pain. (Tr.

561.) A number of treatments were recommended, including injections, "dry needling,"

heat, massage, and physical therapy. (Tr. 561.) Opiate medications were not

recommended. (Tr. 561.) Plaintiff "became upset after hearing . . . [the] recommendations,

and . . . [the] decline to prescribe opiate medication for her." (Tr. 561.)

During an appointment near the end of April for right leg pain, the treatment

provider included a "[h]istory of chronic pain" in Plaintiff's past medical history. (Tr.

497.)

Approximately one month later, Plaintiff was seen for a refill of her hydrocodone prescription. (Tr. 611.) Among other conditions, Plaintiff's past medical history included "[c]hronic pain syndrome." (Tr. 611.) Plaintiff was assessed as having "[c]hronic neck pain" and given a one-week refill of hydrocodone until she could be seen by Dr. Timsina. (Tr. 611.)

Plaintiff was able to see Dr. Timsina a few days later, who noted that she continued to experience neck pain following her surgery and described it as "a history of chronic neck pain status post cervical spinal fusion." (Tr. 609.) Dr. Timsina noted that "[t]here has been a plan about her being sent to [a] pain clinic. She went to on[e] pain clinic in Fargo, but was not very happy with the plan. She has another pain clinic assessment lined up for next week." (Tr. 609.) Dr. Timsina noted that Plaintiff had enough pain pills until she was able to been seen at the pain clinic. (Tr. 609.)

At the end of May, Plaintiff saw David J. Hanson, MD, at a pain clinic in Fargo, North Dakota for neck, hip, and low-back pain. (Tr. 715.) Plaintiff rated her current pain at a 7 out of 10. (Tr. 712.) Upon examination, Dr. Hanson noted:

> Range of motion of the arms at the shoulders is decreased with flexion bilaterally. Range of motion of the head is severely limited with flexion and extension of the neck and moderately limited with rotation in both directions. There is apprehension with straight leg raise at about 40[ degrees] bilaterally. There is apprehension with Faber test on the left and hip pain with Faber test on the right. The infraorbital nerves are both tender to palpation, the right subclavicular area is tender. The anterior pelvis is nontender. The occiput is nontender. Trapezius muscles of both tender to palpation, the serratus anterior muscles and the paraspinous muscles in the lumbar region are tender to palpation bilaterally. Both SI . . . joints are mildly

> tender and both greater trochanters are tender to palpation. The knees are nontender.

(Tr. 708, 712.)

Dr. Hanson diagnosed Plaintiff with cervical and lumbar radiculopathy, low back pain, cervicalgia, myofascial pain syndrome, and bursitis. (Tr. 710.) Dr. Hanson recommended trigger point and steroid injections. (Tr. 710-11.)

Plaintiff saw Dr. Hanson again approximately one week later for treatment of her "myofascial pain syndrome that is causing pain in the back of the neck and the upper back bilaterally." (Tr. 707.) Plaintiff again rated her pain at a 7 out of 10. (Tr. 707.) Plaintiff wanted to proceed with trigger point injections and also "need[ed] medications." (Tr. 707.) Dr. Hanson noted that there were "trigger points present in the trapezius, rhomboids and posterior neck muscles bilaterally." (Tr. 706.) Dr. Hanson prescribed a 30-day supply of hydrocodone-acetaminophen[7] and administered trigger point injections. (Tr. 705.)

Around the middle of June, Plaintiff was seen in orthopedics for a labral tear in her right hip. (Tr. 605.) Plaintiff's past medical history listed "[c]hronic pain syndrome" as of "10/3/2014." (Tr. 606.) During the appointment, Plaintiff "also mentioned pain in her wrists, hands, and ankles," which made her treatment provider wonder about possible rheumatoid arthritis and noted that Plaintiff was scheduled to be seen in rheumatology. (Tr. 605.)

Plaintiff had another three visits with Dr. Hanson during June and into the first part of July. (Tr. 695, 699, 703.) Plaintiff twice received trigger point injections and once

---

[7] *See supra* n.6.

received a lumbar epidural steroid injection.  (Tr. 695, 697, 701.)  Plaintiff reported that the trigger point injections were beneficial and helped relieve her pain.  (Tr. 699, 703.)  During visits where trigger point injections were administered, Dr. Hanson noted that "trigger points [were] present in the posterior neck muscles, trapezius, and rhomboids bilaterally," and Plaintiff was tender in these areas.  (Tr. 698, 702.)  Dr. Hanson also prescribed another 30-day supply of hydrocodone-acetaminophen.  (Tr. 697.)

Plaintiff followed up with Knutson towards the beginning of July.  (Tr. 603.)  While Plaintiff's headaches and arm pain had improved, Knutson noted that Plaintiff "continue[d] to have neck spasm, muscle pain, and require[d] pain management for trigger point injections."  (Tr. 603.)  Knutson noted that Plaintiff was "fighting Workman's Comp."  (Tr. 603.)

Knutson noted that Plaintiff "is able to stand and walk with normal posture and stride."  (Tr. 603.)  Plaintiff "ha[d] palpable cervical paraspinal muscle spasm present," but also full strength in her upper extremities.  Knutson assessed Plaintiff as having "[c]hronic pain" and directed her to follow up as needed.  (Tr. 603.)

In the beginning of August, Plaintiff presented to the emergency room with a headache lasting for several days.  (Tr. 593.)  Plaintiff's history of chronic pain syndrome was noted in her past medical history and the final impressions.  (Tr. 593, 601.)

Towards the end of August, Plaintiff had a rheumatology consultation.  (Tr. 588.)  In relevant part, it was noted that Plaintiff continued to experience "moderate pain in the neck" following her surgery.  (Tr. 588.)  Plaintiff reported being "stiff in the morning for 1 to 1-1/2 hours."  (Tr. 588.)  During the examination, it was noted, among other things,

that Plaintiff's neck movement was limited. (Tr. 589.) Plaintiff had some tenderness in her cervical spine, sacroiliac "areas," and "over the trochanteric areas." (Tr. 589.) Plaintiff had "a lot of tenderness and spasm in the trapezius and supraspinatus muscles." (Tr. 589.) While additional testing was ordered to confirm, it was thought that Plaintiff did not have "any systemic rheumatoid disease," but rather "a combination of myofascial pain and osteoarthritis of the cervical spine and a little bit of the lumbar spine." (Tr. 589.)

At the end of November, Plaintiff followed up with orthopedics concerning right hip pain. (Tr. 581.) Chronic pain syndrome was again listed in Plaintiff's past medical history. (Tr. 582.)

Between August and December, Plaintiff continued to see Dr. Hanson for treatment of her myofascial pain syndrome and accompanying pain and stiffness. (Tr. 675, 678, 681, 689, 687, 690.) At Plaintiff's November appointment, she reported that she had "been taking care of an 18-month-old child and ha[d] to do a lot of bending over and picking up while taking care of the child."[8] (Tr. 678.) Plaintiff also reported that she was "bothered by long car rides." (Tr. 678.)

Plaintiff continued to experience relief with trigger point injections. (Tr. 690.) Dr. Hanson continued to document trigger points present in the muscles at the back of Plaintiff's neck and "the trapezius, the rhomboids, and the muscles around [the] scapula bilaterally." (Tr. 689; *see* Tr. 677, 686.) In December, Plaintiff had "mild tenderness over the right greater trochanter." (Tr. 674.) Dr. Hanson continued to administer trigger point

---

[8] At the hearing before the ALJ, Plaintiff testified that she is not sure who the 18-month-old child is that Dr. Hanson is referring to. (Tr. 56.) Plaintiff does, however, help babysit her two grandchildren, one of whom lives with her. (Tr. 53-55.) *See infra* Section V.B.

injections and provide 30-day supplies of medication. (Tr. 673, 676, 676, 682, 685, 688.) Dr. Hanson made some adjustments to the dosing of Plaintiff's medication, increasing the dose in the morning, which Plaintiff found beneficial. (Tr. 681-82.)

Plaintiff returned to Dr. Vijayalakshmi after over a year around the middle of December. (Tr. 574.) Plaintiff reported that "she has had continuing symptoms of ongoing posterior neck, upper back, [and] mid back pain along with significant headaches." (Tr. 574.) Plaintiff reported that "she is noticing improvement with these symptoms from trigger point injections." (Tr. 577.)

Plaintiff also requested that Dr. Vijayalakshmi complete certain paperwork for her. (Tr. 574.) Dr. Vijayalakshmi noted that Plaintiff was currently seeing multiple treatment providers, including through the pain clinic and orthopedics. (Tr. 575.) Dr. Vijayalakshmi told Plaintiff that she was not comfortable completing paperwork for her, and Plaintiff needed to have any work/work restrictions completed by neurosurgery in light of her fusion surgery. (Tr. 575.) Dr. Vijayalakshmi emphasized to Plaintiff that she would not complete any paperwork. (Tr. 576; *see also, e.g.*, Tr. 577-78.)

Dr. Vijayalakshmi recommended that Plaintiff follow up with her other treatment providers. (Tr. 575, 577-78.) Among other conditions, Dr. Vijayalakshmi included "[m]yofascial pain and dysfunction syndrome" and "[c]hronic pain syndrome" among Plaintiff's diagnoses. (Tr. 577.) Dr. Vijayalakshmi noted that she did "not have anything more to offer from a physical medicine and rehabilitation clinic standpoint," and Plaintiff would "not be scheduled [for] any further follow[]up." (Tr. 578.)

### 3. 2016

As part of an annual physical in January 2016, "[c]hronic pain syndrome" was listed in Plaintiff's past medical history and included among her final diagnoses. (Tr. 572-73.)

Plaintiff saw Dr. Baker at the beginning of February concerning paperwork for her worker's compensation proceeding. (Tr. 569.) Plaintiff continued to report neck pain and headaches, among other things. (Tr. 569.) Dr. Baker recommended that Plaintiff consult with a neurologist concerning her headaches. (Tr. 569.) With regards to questions related to the worker's compensation proceedings, Dr. Baker noted that it was "unclear to [him]" the degree to which Plaintiff's work as an embroiderer accelerated or worsened her spinal disorder, "but clearly based on [the] description of her job, it may have contributed to exacerbation of her baseline cervical degenerative disorder." (Tr. 570.) As for further treatment, Dr. Baker again recommended seeing a neurologist in connection with her headaches. (Tr. 570.)

As for Plaintiff's ability "to work without restriction," Dr. Baker noted:

> I strongly recommend that [she] be evaluated by an occupational medicine physician for proper testing of each individual muscle group to determine maximal medical improvement and objectively assess her current state to determine whether she can go back to work without restriction. On my assessment she does have full strength in her upper extremities with no deficit on gross motor testing and no deficit on sensory examination.

(Tr. 570.) Similarly, Dr. Baker stated that he "cannot comment on the degree of disability in a comprehensive fashion, but in a limited fashion pertaining to cervical surgery, she has

5 out of 5 strength in individual motor group testing, which is a fairly robust examination." (Tr. 570.)

Plaintiff saw Dr. Hanson once per month between January and March. (Tr. 666, 669, 672.) These visits primarily focused on medication management. (Tr. 664, 666-67, 669-70, 672.) In January, Plaintiff asked about possible treatment for right hip pain, reporting that "[t]he pain is not very bad now, but there are times when the pain is so bad she has to use a walker." (Tr. 672.) Dr. Hanson noted that Plaintiff had "some tenderness over the right great trochanter" and administered another lumbar epidural steroid injection. (Tr. 670-71.) In February, Plaintiff requested to lower her medication dose to its prior level. (Tr. 669.)

In early April 2016, Plaintiff underwent a functional capacity evaluation. (Tr. 541-555, 646-55.) Prior to testing, it was confirmed with both neurosurgery and orthopedics that Plaintiff had no lifting, positional or other restrictions. (Tr. 541, 646.) The evaluator noted that while Plaintiff "was pleasant and voiced willingness to fully participate in testing, six test items were self-limited prior to objective signs of maximum effort." (Tr. 541; *accord* Tr. 646.) These included "all lifts and carries, crouching, and elevated work (both weighted and unweighted)." (Tr. 541; *accord* Tr. 646.) Plaintiff reported "fear of re-injury or increasing pain as a reason for not continuing." (Tr. 541; *accord* Tr. 646.) The evaluator noted that Plaintiff often demonstrated slow, exaggerated, and deliberate movement patterns which required more effort. (Tr. 542, 647.) The evaluator did find that Plaintiff "was consistent in giving maximum effort in hand/finger coordination tests, push/pull, FB [sic] standing, sitting, and standing work." (Tr. 542; *accord* Tr. 647.)

The evaluator concluded that Plaintiff's "Abilities/Strengths" were "[s]itting and walking on an occasional basis"; "[s]tanding work on [a] frequent basis"; "[k]neeling on [a] frequent basis"; and "[a]verage hand coordination." (Tr. 542; *accord* Tr. 647.) Plaintiff's "Limitations" were "[f]orward bend in standing due to decreased core/cervical strength/stability"; "[w]alking – begins to favor right lower extremity as time/distance increase"; and "[s]tair [c]limbing – able to safely negotiate stairs, but will have limitations due to walking limitations." (Tr. 542; *accord* Tr. 647.) The evaluator additionally noted that while Plaintiff had self-limited during lifting and carrying tests, she was observed to be able to lift 20 pounds from the floor to her waist frequently, and lift 15 pounds from her waist to her head frequently. (Tr. 542, 647.) Plaintiff was able to carry 15 pounds frequently and 25 pounds occasionally. (Tr. 543, 647.) Ultimately, the evaluator was not able to determine Plaintiff's "physical demand level" due to her self-limiting. (Tr. 543; *accord* Tr. 647.) The evaluator noted that Plaintiff "state[d] she might be able to tolerate a job that is 'light duty.'" (Tr. 552; *accord* Tr. 655.)

Plaintiff followed up with Dr. Timsina at the end of April with continued complaints of neck and back pain. (Tr. 644.) Dr. Timsina noted that Plaintiff "had a nonunion at C5-C6" following her surgery, and ordered an MRI to further evaluate. (Tr. 644; *see* Tr. 565, 629.) The MRI showed "no postoperative changes," and Dr. Timsina told Plaintiff to talk with Dr. Baker to see if additional action should be taken. (Tr. 747.)

Plaintiff continued to see Dr. Hanson approximately once per month between April and July. (Tr. 717-21.) These appointments were again primarily focused on medication management, and, in June, Plaintiff's dosage was again increased. (Tr. 717-21.) During

this time, Plaintiff also had a set of trigger point injections and another lumbar epidural steroid injection. (Tr. 720-21.) In April, Plaintiff had "trigger points present in the back of the neck, across the upper back and shoulders and in the lumbar and gluteal muscles bilaterally." (Tr. 721.) In June, Dr. Hanson noted that Plaintiff's "[r]ange of motion of the neck is limited with rotation, flexion and extension in both directions." (Tr. 718.) At her next appointment in July, Plaintiff continued to have "limited range of motion of the neck." (Tr. 717.) Her right greater trochanter was nontender, but she had "some tenderness to palpation in the inter scapular area." (Tr. 717.)

### B. Mental Health Records

Plaintiff has been seeing Michael E. Stewart, M.D., a psychiatrist, since 2007 for depression. (Tr. 537; *see* Tr. 48.)

#### 1. 2015

Plaintiff saw Dr. Stewart at the end of February 2015. (Tr. 505.) Dr. Stewart noted that "[i]t ha[d] been almost a year since [he] last saw [Plaintiff]," and that she had been "coming in for months seeking treatment through primary care for issues involving chronic pain." (Tr. 505; *see* Tr. 401-02.) Plaintiff completed a PHQ-9 questionnaire, which "plac[ed] her down in the mild range of depression" notwithstanding her self-reporting that her symptoms made functioning "very difficult." (Tr. 505.)

Dr. Stewart noted that Plaintiff was "[p]olite, [and c]ooperative"; made "good eye contact"; and was "engaged well in [the] discussion." (Tr. 506.) Plaintiff "smiled several times" and talked about her children. (Tr. 506.) Dr. Stewart noted that there was "[n]o evident distress here in [the] clinic." (Tr. 506.) Dr. Stewart assessed Plaintiff with mild

depression, continued her Prozac[9] and alprazolam[10] prescriptions, and directed her to return in six months.  (Tr. 506.)

Plaintiff's next appointment with Dr. Stewart was in August.  (Tr. 591.)  Plaintiff's PHQ-9 questionnaire again placed her "in the mild range of depression" while Plaintiff self-reported that her symptoms made functioning "extremely difficult."  (Tr. 591.) Plaintiff reported that "she is struggling, having a 'really tough time' in . . . large part due to medical issues." (Tr. 591.)  Plaintiff "[t]alk[ed] about how discouraging it is to have one problem after another medically." (Tr. 592.)  Dr. Stewart noted that Plaintiff was "[p]olite, cooperative"; her "[a]ffect [wa]s somewhat dysphoric"; and she "made eye contact and engaged very well in . . . [the] discussion."  (Tr. 592.)

Dr. Stewart diagnosed Plaintiff with mild depression, "[l]argely due to situational factors, medical problems."  (Tr. 592.)  Dr. Stewart continued Plaintiff's medications, and suggested that Plaintiff might try changing her antidepressant medication "to one which also tends to alleviate pain." (Tr. 592.)  Dr. Stewart also "talked to [Plaintiff] at length about ways she might look into using her time and convalescence in a productive way," such as pursuing educational opportunities.  (Tr. 592.)  Dr. Stewart directed Plaintiff to

---

[9] Prozac is a brand name for fluoxetine, a medication "used to treat depression, obsessive-compulsive disorder (bothersome thoughts that won't go away and the need to perform certain actions over and over), some eating disorders, and panic attacks (sudden, unexpected attacks of extreme fear and worry about these attacks)." *Fluoxetine*, MedlinePlus, U.S. Nat'l Library of Medicine, https://medlineplus.gov/druginfo/meds/a689006.html (last visited Mar. 4, 2019).

[10] Alprazolam is used to treat anxiety and panic disorders, and can also be used to treat depression.  *Alprazolam*, MedlinePlus, U.S. Nat'l Library of Medicine, https://medlineplus.gov/druginfo/meds/a684001.html (last visited Mar. 4, 2019).  Xanax is a brand name for alprazolam.  *Id.*

return in six to eight weeks "given the fact that she has been struggling more with all her medical problems." (Tr. 592.)

When Plaintiff followed up with Dr. Stewart in early November, her PHQ-9 score, "plac[ed] her at the top of the moderate range of depression." (Tr. 585.) Plaintiff continued to report that her symptoms made functioning "very difficult." (Tr. 585.) Plaintiff also continued to struggle with her physical health. (Tr. 585.) In addition, Plaintiff was stressed over her worker's compensation proceeding. (Tr. 586.) Dr. Stewart noted that Plaintiff can take care of most household chores "as long as she intersperses activity with periods of rest." (Tr. 585.) Plaintiff's children provided some assistance. (Tr. 585.)

Dr. Stewart again observed that Plaintiff made good eye contact and was engaged in the discussion. (Tr. 586.) He further noted that she "does look to be very careful with the way she walks and sits," and "[i]t is quite apparent this is to minimize any pain." (Tr. 586.) Dr. Stewart diagnosed Plaintiff with moderate depression, "[s]omething of an exacerbation, largely due to situational factors related to medical health." (Tr. 586.) No changes were made to her medications. (Tr. 586.)

### 2. 2016

Plaintiff's next appointment with Dr. Stewart was in February 2016. (Tr. 567.) Plaintiff's PHQ-9 score again "plac[ed] her in the moderate range of depression." (Tr. 567.) Plaintiff reported that her "mood has been somewhat better of late." (Tr. 567.) Plaintiff went "on to talk about how just the past 3 weeks she has tried to take her Prozac consistently on a daily basis" as she had previously "been taking the Prozac about 3 doses a week." (Tr. 568.) Similar to prior observations, Dr. Stewart noted that Plaintiff was

polite and cooperative, made good eye contact, and was engaged in the discussion. (Tr. 568.) Dr. Stewart noted that Plaintiff's affect was "mildly dysphoric." (Tr. 568.) Dr. Stewart described Plaintiff as having moderate depression, noting that it was "trending in an improving direction." (Tr. 568.)

## IV. OPINION EVIDENCE

### A. Dr. Stewart

#### 1. 2015

In November 2015, Dr. Stewart completed a mental medical source statement. (Tr. 537-40.) Dr. Stewart listed Plaintiff's diagnosis as "major depression," noting that he saw Plaintiff approximately every 6 to 12 months. (Tr. 537.) Plaintiff's current medications were Prozac and Xanax[11]. (Tr. 538.)

Dr. Stewart checked off numerous signs and symptoms, which he stated were reflective of Plaintiff's mental status examinations during their appointments: poor memory secondary to her depression and medication, appetite disturbance with changes in weight, sleep disturbance, personality changes, mood disturbance, emotional lability, recurrent panic attacks, anhedonia or pervasive loss of interests, psychomotor agitation or retardation, paranoia or inappropriate suspiciousness, feelings of guilt/worthlessness, difficulty thinking or concentrating, social withdrawal or isolation, decreased energy, possible manic syndrome, obsessions or compulsions, intrusive recollections of a traumatic

---

[11] *See supra* n.10.

experience, generalized persistent anxiety, hostility, perceptual disturbances, and irritability.  (Tr. 537.)

Dr. Stewart opined that Plaintiff was likely to be off-task 25% or more of the time. (Tr. 538.)  Dr. Stewart also opined that Plaintiff was likely to be absent from work four or more days per month.  (Tr. 538.)

When asked if Plaintiff's ability to understand and carry out instructions was impaired, Dr. Stewart checked "yes."  (Tr. 538.)  Dr. Stewart then proceeded to check "marked loss" in the form's definition section, which was defined as "[s]ubstantial loss of ability in the named activity; can sustain performance only up to 1/3 of an 8-hour workday." (Tr. 538.)  Elsewhere, Dr. Stewart specifically checked that Plaintiff had marked loss in her abilities to understand and remember complex instructions, maintain attention and concentration for extended periods, maintain regular attendance and be punctual, deal with the stress of semi-skilled and skilled work, perform at a consistent pace without unreasonable breaks, and complete a normal workday or workweek without interruption. (Tr. 539.) Dr. Stewart checked that Plaintiff had moderate loss in her abilities to sustain an ordinary routine without special instruction and work in coordination with or proximity to others without distraction.  (Tr. 539.)  Lastly, Dr. Stewart checked that Plaintiff had no or mild loss in her ability to make simple work-related decisions.[12]  (Tr. 539.)  Dr. Stewart's

---

[12] The copy of Dr. Stewart's medical source statement is not ideal.  It is not clear what Dr. Stewart opined with respect to Plaintiff's abilities to remember locations and work-like procedures, understand and remember very simple instructions, and carry out simple instructions.  (Tr. 538.)  Based on the copy in the record, it does not appear that Dr. Stewart checked anything for these three items.

opinion was based on Plaintiff "depressed mood, chronic pain, [and] problems with concentration/focus."  (Tr. 539.)

When asked if Plaintiff's abilities to respond to supervisors, coworkers, and pressure in a work setting were affected, Dr. Stewart checked "yes."  (Tr. 539.)  Dr. Stewart checked that Plaintiff had a marked loss in her ability to deal with the public.  (Tr. 539.)  Dr. Stewart checked that Plaintiff had moderate loss in her abilities to accept instructions and respond appropriately to criticism from supervisors, get along with coworkers and peers, maintain socially appropriate behavior, and respond appropriately to changes in the work setting. (Tr. 539.)  Dr. Stewart checked that Plaintiff had no or mild loss in her abilities to ask simple questions or request assistance, adhere to basic standards of neatness and cleanliness, and be aware of normal hazards.  (Tr. 539.)

Dr. Stewart further opined that Plaintiff had slight restriction in her activities of daily living and slight difficulties in social functioning.  (Tr. 539.)  Dr. Stewart opined that Plaintiff had frequent difficulties with concentration, persistence or pace.  (Tr. 539.)

Dr. Stewart next answered questions about episodes of deterioration or decompensation.  (Tr. 540.)  Based on the quality of the copy in the record, *see supra* n.12, Dr. Stewart's responses to these questions are not entirely clear.  (*See* Tr. 540.)  In the explanation section, Dr. Stewart wrote, "extreme hip pain [secondary] to labral tear"; "episodes [of] depressed mood"; and "fusion surgery on cervical spine."  (Tr. 540.)  When asked how many episodes of decompensation Plaintiff had experienced in the last 12 months, Dr. Stewart responded similarly: "cervical fusion surgery"; "exacerbations of

depression [secondary] to stress [and] pain [and] loss of function"; and "labral tear." (Tr. 540.)

## 2. 2016

In or around July 2016, Dr. Stewart completed a mental residual functional capacity assessment form.[13] (Tr. 724-27.) With respect to understanding and memory, Dr. Stewart checked that Plaintiff was not significantly limited in her ability to understand and remember very short and simple instructions; was moderately limited in her ability to remember locations and work-like procedures; and was markedly limited in her ability to understand and remember detailed instructions. (Tr. 724.)

As for sustained concentration and persistence, Plaintiff was not significantly limited in her abilities to carry out very short and simple instructions, sustain an ordinary routine without supervision, and make simple work-related decisions. (Tr. 724.) Plaintiff was moderately limited in her ability to work in coordination with or proximity to others. (Tr. 724.) Plaintiff was markedly limited in her abilities to carry out detailed instructions and maintain attention and concentration for extended periods. (Tr. 724.) Plaintiff was also markedly limited in her abilities to perform activities within a schedule (including maintaining regular attendance and punctuality), complete a normal workday and work week without interruption, and perform at a consistent pace without unreasonable rest periods. (Tr. 724-25.)

---

[13] The mental residual functional capacity assessment form is not signed or dated. (Tr. 726.) It is accompanied by a letter dated July 21, 2016, requesting that this form and a psychiatric review technique form be completed prior to the August hearing with the ALJ. (Tr. 723.) There are various facsimile date and time stamps on both forms from July and August. (*See* Tr. 723-741.)

Regarding Plaintiff's social abilities, Plaintiff was not significantly limited in her abilities to interact appropriately with the public, ask questions or request assistance, and maintain socially appropriate behavior. (Tr. 725.) Plaintiff was moderately limited in her abilities to respond appropriately to criticism from supervisors and get along with coworkers. (Tr. 725.)

Lastly, with respect to adaptation abilities, Plaintiff was not significantly limited in her ability to respond appropriately to changes in the work setting. (Tr. 725.) Plaintiff was moderately limited in her abilities to recognize and respond appropriately to normal hazards, set realistic goals, and make plans independently of others. (Tr. 725.) Plaintiff was markedly limited in her ability to travel to unfamiliar places or use public transportation. (Tr. 725.)

Dr. Stewart also completed portions of a psychiatric review technique form.[14] (Tr. 728-41.) Dr. Stewart did not check any of the boxes in the "Medical Disposition(s)" category, such as whether there was no medically determinable impairment, there was an impairment but it was not severe, or that the impairment met or equaled a listed impairment. (Tr. 728.) Dr. Stewart then checked listing 12.04 for affective disorders when asked about the basis for the medical disposition. (Tr. 728.)

Dr. Stewart next proceeded to check a number of boxes regarding the presence of symptoms under a handful listings. (Tr. 729-33.) For listing 12.02 pertaining to organic mental disorders, Dr. Stewart checked "[d]isturbance in mood." (Tr. 729.) For affective

---

[14] *See supra* n.13.

disorders under listing 12.04, Dr. Stewart checked that Plaintiff's depression included symptoms of anhedonia, appetite disturbance, sleep disturbance, psychomotor agitation, decreased energy, feelings of guilt or worthlessness, and difficulty concentrating or thinking. (Tr. 731.) Lastly, under listing 12.06 for anxiety-related disorders, Dr. Stewart checked "[m]otor tension," "[a]pprehensive expectation," and panic attacks, which he noted were a "recent development." (Tr. 733.)

Dr. Stewart then opined on Plaintiff's functional limitations. Dr. Stewart checked that Plaintiff had moderate restriction of activities of daily living and had marked restriction in maintaining social functioning as well as concentration, persistence, or pace. (Tr. 738.) Dr. Stewart additionally opined that Plaintiff had four or more episodes of decompensation of extended duration. (Tr. 738.)

### B.  State Agency Psychological Consultants

Plaintiff's depression was determined to be a non-severe impairment under the listing for affective disorders both during the initial determinations and during the subsequent reconsiderations. (Tr. 69, 79, 92, 103.) Each time, the state agency psychological consultants opined that Plaintiff had mild restriction in activities of daily living and in her ability to maintain concentration, persistence, or pace; had no difficulties with social functioning; and experienced no episodes of decompensation. (Tr. 69, 79, 92, 103.)

## V. PLAINTIFF'S DISABILITY REPORTS & HEARING TESTIMONY

### A. Disability Reports

In connection with her applications, Plaintiff completed a function report. (Tr. 257-64.) When asked how her conditions limit her ability to work, Plaintiff stated that she has pain in her neck, which travels to her shoulders and "up the back of [her] head"; in her arms, which is accompanied by numbness; and in her back, which radiates into her legs. (Tr. 257.) Plaintiff also experiences "eye soreness, headaches, and light sensitivity." (Tr. 257.)

In a typical day, Plaintiff made coffee, took her medications, prepared her son for school, attended to her personal care, washed dishes, did laundry, rested, watched television, read, and made supper for her son. (Tr. 258; *see* Tr. 262, 286.) Plaintiff also helped her son with homework and "support[ed him] in activities." (Tr. 258.) Plaintiff additionally cared for her dogs. (Tr. 258, 260, 286.)

Plaintiff prepared meals daily, but the type of food and time for preparation varied with fatigue and pain. (Tr. 259.) Plaintiff performed household chores indoors, such as dishes, laundry, sweeping, and trash disposal, but needed help with outside chores such as shoveling. (Tr. 259-60.) Plaintiff was able to drive. (Tr. 260.) Plaintiff shopped in stores for approximately one hour per week for food, personal products, and household supplies. (Tr. 260.)

Plaintiff stated that her conditions result in her feeling more tired, being less social, and being less active than she was before. (Tr. 258; *see* Tr. 261-62, 289.) Plaintiff's pain also affected her sleep. (Tr. 258, 286.) Plaintiff reported that her conditions affected her

abilities to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, remember, complete tasks, concentrate, and use her hands.  (Tr. 261.)  She was "not as strong due to pain or [had] more pain to follow if . . . [she did] these items too much."  (Tr. 261; *see* Tr. 290.) Plaintiff was "not sure" how long she could walk before needing to rest.  (Tr. 261.)  Plaintiff was also "not sure" how long she could pay attention.  (Tr. 261.)  Plaintiff sometimes finished what she started.  (Tr. 261; *see* Tr. 290.)  Plaintiff responded "ok" when asked how well she follows written and spoken instructions, stating that she sometimes asks to have something repeated.  (Tr. 262.)

When describing her social activities, Plaintiff regularly had coffee with her parents, talked on the phone with a daughter, and visited with her children at home.  (Tr. 262.) Plaintiff described her ability to get along with authority figures as "ok."  (Tr. 263.)

Plaintiff was "not sure" how she handled stress and did not handle changes in routine well.  (Tr. 263; *see* Tr. 291.)  Plaintiff reported worrying about her health and finances. (Tr. 263.)

In a subsequent report, Plaintiff stated that her conditions had worsened, and she was having "[d]ifficulty doing anything due to pain" and her "[m]ental health ha[d] gotten significantly worse."  (Tr. 276; *see* Tr. 280.)

In a later function report, Plaintiff noted that it was "very painful to tilt [her] head up and down" and she has difficulty lifting things over her head, including washing her hair. (Tr. 285.)  Plaintiff reported that she has muscle spasms in her neck daily; her "[e]ntire body is in great pain in [the] morning"; and "[e]xtension movements that put strain on [her] neck [and] back such as vacuuming or changing a light bulb are hard [and] can put [her]

down the next day if [she] do[es] too much." (Tr. 285.) Plaintiff reported that more than "15 minutes of vacuuming is too much." (Tr. 285.) Twisting motions caused pain as well. (Tr. 286.) Plaintiff also needed to rest in the afternoon to "get [her] physical [and] mental health back under control before [her] son comes home from school." (Tr. 285.)

Plaintiff additionally reported that she "struggle[s] with not wanting to leave the house because [her] anxiety [and] depression are very high" and she misses family functions. (Tr. 285.) Plaintiff reported needing help with her medication, noting that because she feels better when taking her mental-health medication, she will stop taking it, and then things worsen. (Tr. 287.)

Plaintiff most often made simple, convenience foods, and now prepared meals "2-3 days a week on a good week." (Tr. 287.) Plaintiff continued to perform household chores for approximately 45 minutes per day with breaks. (Tr. 287.) Plaintiff reported that her parents assist her, her "daughter helps when [she is] unable to do things," and her son helped with laundry, carrying things downstairs, and yardwork. (Tr. 286; *see* Tr. 287.) Plaintiff now shopped only twice per month for approximately 30 to 45 minutes. (Tr. 288.)

Plaintiff reported that her "mental health [and] pain make it difficult to concentrate [and] complete most tasks." (Tr. 290.) They also made "it difficult for [her] to get along with others." (Tr. 290.) This time, Plaintiff reported that her ability to pay attention depended on the task. She had "no problem" with tasks that were not stressful, but found it "hard to concentrate" for "emotional or detailed" tasks. (Tr. 290.) Plaintiff reported that sometimes she "rush[es]" through written instructions, but "do[es] okay." (Tr. 290.) Plaintiff reported that spoken instructions were not "too much of a problem." (Tr. 290.)

Plaintiff also reported that she sometimes becomes "aggravated" and "frustrated" with doctors, but does not have difficulties getting along with "police, bosses[, and] landlords." (Tr. 291.)

Later, Plaintiff continued to report deterioration in her mental health due to "dealing with the pain from [her] condition." (Tr. 296.) Plaintiff was also under increasing financial pressure, which affected her stress level. (Tr. 296.)

### B. Hearing Testimony

At the hearing before the ALJ, Plaintiff testified that she has had pain in her neck ever since she was in a car accident as a child. (Tr. 37.) Plaintiff testified that the soreness in her neck progressively worsened and was accompanied by headaches and "lock-up episodes" where she was unable to turn and movement was "extremely painful." (Tr. 38.) Plaintiff testified that all of the "looking down" and "shoulder use" was difficult for her while working as an embroiderer. (Tr. 37-38.) Plaintiff's hands were also swollen and tingled. (Tr. 39-40.)

Plaintiff testified that, after her surgery, she still had tingling in her hands and constant, ongoing pain. (Tr. 41.) Plaintiff testified that "[e]very part of [her] life . . . is affected." (Tr. 41.) Plaintiff's pain is "always there." (Tr. 45.) Plaintiff testified that she has trouble with anything above her shoulder, lifting, and twisting motions. (Tr. 41, 45; *see* Tr. 47.) Plaintiff also had difficulties sitting and standing too long. (Tr. 45.) Plaintiff estimated that she could sit for approximately 30 minutes before needing to stand up or move around. (Tr. 46.) Plaintiff testified that, throughout the day, she has to be mindful of what she does and her tolerance so as not to increase her pain. (Tr. 42.) Plaintiff testified

that she uses rest, heat, and ice to deal with her pain. (Tr. 43.) Plaintiff estimated that she would probably miss work five times per month due to pain. (Tr. 52.)

Plaintiff testified that she is unable to cook dinner approximately three to four times per week due to pain. (Tr. 43.) Plaintiff also testified that she is sometimes unable to attend her son's athletic events due to pain. (Tr. 44.) Plaintiff testified that she "used to attend even away games or away events," but now misses approximately three home games in a single season. (Tr. 44.) Plaintiff also limited her social activities. (Tr. 45.)

At the hearing, Plaintiff was asked about why she was not able to complete the functional capacity evaluation. (Tr. 46-47.) Plaintiff testified that she "was having extreme pain." (Tr. 46.) Plaintiff testified that she tried to complete the tests by adjusting how her arms were positioned, such as pulling the weight "in closer to [her] body" but that was not part of the test protocol. (Tr. 47.) Plaintiff testified that "[t]he pain was too much and too severe." (Tr. 47.)

Plaintiff testified that she has been seeing Dr. Stewart for over ten years. (Tr. 48.) Plaintiff discussed her pain with him "because it has a lot to do with [her] life and everything." (Tr. 48.) Plaintiff testified that the pain impacted her mental health, describing a mind-body connection where thoughts became "charged by the pain," and things that were once easier to deal with became harder to do. (Tr. 49.) Plaintiff testified that she could pay attention sufficiently long to watch a two-hour movie, but had trouble with more active concentration such as paying bills and balancing a checkbook. (Tr. 49-50.) Plaintiff testified that she could pay attention for approximately 10 minutes while performing a simple task. (Tr. 52.)

Plaintiff testified that she currently lives with her teenage son, an adult daughter, and her nine-month-old granddaughter. (Tr. 53.) Plaintiff testified that her daughter primarily cares for her granddaughter, but sometimes she babysat, such as when her daughter needs to go to the store. (Tr. 54.) Plaintiff testified that while she is able to lift her granddaughter, it is difficult to do so. (Tr. 55.) Plaintiff testified she also assists with babysitting her other daughter's newborn while the daughter who lives with her has primary responsibility. (Tr. 55.) Plaintiff testified that her grandchildren are at her house for "a couple of hours" during a work day. (Tr. 55.)

## VI. ANALYSIS

This Court reviews whether the ALJ's decision is supported by substantial evidence in the record as a whole. *Boettcher v. Astrue*, 652 F.3d 860, 863 (8th Cir. 2011). "Substantial evidence means less than a preponderance but enough that a reasonable person would find it adequate to support the decision." *Id.* This standard requires the Court to "consider both evidence that detracts from the [ALJ's] decision and evidence that supports it." *Id.* The ALJ's decision "will not [be] reverse[d] simply because some evidence supports a conclusion other than that reached by the ALJ." *Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012). "The court must affirm the [ALJ's] decision if it is supported by substantial evidence on the record as a whole." *Chaney v. Colvin*, 812 F.3d 672, 676 (8th Cir. 2016) (quotation omitted). Thus, "[i]f, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." *Perks*, 687 F.3d at 1091 (quotation omitted); *accord Chaney*, 812 F.3d at 676.

Disability benefits are available to individuals who are determined to be under a disability. 42 U.S.C. §§ 423(a)(1), 1381a; *accord* 20 C.F.R. §§ 404.315, 416.901. An individual is considered to be disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A); *see also* 20 C.F.R. §§ 404.1505(a), 416.905(a). This standard is met when a severe physical or mental impairment, or impairments, renders the individual unable to do her previous work or "any other kind of substantial gainful work which exists in the national economy" when taking into account her age, education, and work experience. 42 U.S.C. § 423(d)(2)(A); *accord* 42 U.S.C. § 1382c(a)(3)(B); *see also* 20 C.F.R. §§ 404.1505(a), 416.905(a).

Disability is determined according to a five-step, sequential evaluation process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

> To determine disability, the ALJ follows the familiar five-step process, considering whether: (1) the claimant was employed; (2) she was severely impaired; (3) her impairment was, or was comparable to, a listed impairment; (4) she could perform past relevant work; and if not, (5) whether she could perform any other kind of work.

*Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010). In general, the burden of proving the existence of disability lies with the claimant. 20 C.F.R. §§ 404.1512(a), 416.912(a).

**A. Issues Raised**

Plaintiff's challenges revolve around the ALJ's treatment of her chronic pain syndrome. Plaintiff asserts that her claims for DIB and SSI were "predicated upon her chronic pain syndrome and the interaction between her pain and depression." (Pl.'s Mem. in Supp. at 2, ECF No. 14.) Plaintiff argues that the ALJ erred by not addressing her chronic pain syndrome at step two as either a severe or non-severe impairment. Plaintiff further argues that the alleged error at step two led to the ALJ failing to consider her pain and depression properly in combination, the opinion of her treating physician, and her subjective complaints.

**B. Chronic Pain Syndrome as a Severe Impairment**

The ALJ found and concluded that Plaintiff had two severe impairments: cervical degenerative disc disease and depression. (Tr. 14.) In reaching this conclusion, the ALJ also discussed Plaintiff's leg and hip pain as well as degenerative changes in her lumbar spine. (Tr. 15.) The ALJ found these conditions were all non-severe. (Tr. 15.) The ALJ observed that Plaintiff did not pursue treatment options for her leg and hip pain and her hip pain improved "not long after." (Tr. 15.) The ALJ also observed that Plaintiff's medication was effective for her headaches and she did not seek further treatment. (Tr. 15.) Similarly, with respect to Plaintiff's lumbar spine, the ALJ noted that, while imaging reflected degenerative changes, "these findings were described as 'mild' and [Plaintiff] was advised that there was no need for surgical intervention." (Tr. 15.) The ALJ further noted that "[p]hysical examinations throughout the file do not show that she has had any significant

gait issues or decreased strength in her lower extremities." (Tr. 15.) The ALJ did not specifically discuss chronic pain syndrome.

Plaintiff asserts that "[t]he ALJ committed reversible error by failing to assess [her] chronic pain syndrome as severe or non-severe at step [two]." (Pl.'s Mem. in Supp. at 4.) Plaintiff asserts that, "[w]hile the ALJ discusses [her] pain in general terms as part of the residual functional capacity finding at step [four], this does not obviate the need to make findings regarding her medically-determinable chronic pain syndrome earlier in the sequential evaluation process." (Pl.'s Mem. in Supp. at 6.) Plaintiff asserts that, "[i]n this circuit, improper consideration of a medically determinable impairment at step [two] is not 'harmless error,'" citing *Nicola v. Astrue*, 480 F.3d 885, 887 (8th Cir. 2007). (Pl.'s Reply at 1, ECF No. 17.)

The Commissioner responds that Plaintiff has failed to meet her burden to show that her chronic pain syndrome is a severe impairment because the records referenced by Plaintiff at most indicate a prior diagnosis, which is not sufficient to establish that her chronic pain syndrome resulted in functional limitations. Citing case law from the Sixth, Ninth, and Tenth Circuits, the Commissioner further responds that any error by the ALJ at step two with respect to Plaintiff's chronic pain syndrome was harmless because the ALJ found at least one severe impairment and proceeded to the next step in the sequential evaluation process.

At step two, the ALJ considers the severity of a claimant's medically determinable impairments. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). If a claimant does not have an impairment or combination of impairments that significantly limits her ability to

do basic work activities, such impairment or impairments are not severe and the claimant is not disabled. 20 C.F.R. §§ 404.1520(c), 416.920(c); *see Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007) ("Step two of the evaluation states that a claimant is not disabled if his impairments are not 'severe.'"). "An impairment is not severe if it amounts to only a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby*, 500 F.3d at 707. Basic work activities include but are not limited to things like walking, standing, sitting, lifting, reaching, seeing, hearing, speaking, following instructions, using judgment, responding appropriately to coworkers and supervisors, and dealing with changes in the work setting. 20 C.F.R. §§ 404.1522(b), 416.922(b). "If the impairment would have no more than a minimal effect on the claimant's ability to work, then it does not satisfy the requirement of step two." *Kirby*, 500 F.3d at 707. It is Plaintiff's burden to establish that her chronic pain syndrome singly or in combination with other impairments is a severe impairment. *Id.* While this "is not an onerous requirement . . . , . . . it is also not a toothless standard." *Id.* at 708.

As recently observed by a district court in South Dakota, "[w]hether failure to identify a severe impairment at step two is harmless error or grounds for reversal is a murky issue in the Eighth Circuit." *Lathrop v. Berryhill*, No. 4:18-CV-04025-VLD, 2019 WL 122051, at *16 (D. S.D. Jan. 7, 2019). Analysis generally begins with *Nicola*, and Plaintiff has relied on *Nicola* in this case. In *Nicola*, the claimant claimed that she was disabled due to, among other things, borderline intellectual functioning. 480 F.3d at 886. On appeal, the claimant "assert[ed] that the ALJ erred in failing to include her diagnosis of borderline intellectual functioning as a severe impairment at step two of the sequential analysis." *Id.*

at 887. While conceding that the claimant's borderline intellectual functioning should have been considered a severe impairment, the Commissioner argued that the ALJ's error was harmless. *Id.* The Eighth Circuit Court of Appeals "reject[ed] the Commissioner's argument of harmless error." *Id.* The Eighth Circuit observed that "[a] diagnosis of borderline intellectual functioning should be considered severe when the diagnosis is supported by sufficient medical evidence." *Id.* The Eighth Circuit reversed and remanded the case for further proceedings. *Id.*

"[D]istrict courts within the Eighth Circuit are not[, however,] in agreement about the holding of *Nicola*." *Lathrop*, 2019 WL 122051, at *16 (citing *Lund v. Colvin*, No. 13-cv-113 (JSM), 2014 WL 1153508, at *26 (D. Minn. Mar. 21, 2014) (collecting cases)); *see also Johnson v. Comm'r of Soc. Sec.*, No. 11-cv-1268 (JRT/SER), 2012 WL 4328413, at *21 (D. Minn. July 11, 2012), *adopting report and recommendation*, 2012 WL 4328389 (D. Minn. Sept. 20, 2012). "Some [c]ourts have interpreted *Nicola* to mean that an error at step two can never be harmless." *Lund*, 2014 WL 1153508, at *26 (citing cases); *see also Johnson*, 2012 WL 4328413, at *21. In *Johnson*, a magistrate judge in this District noted that such "a broad interpretation of *Nicola* is inconsistent with the rule in the majority of other Circuits and the deferential standard afforded to the Commissioner's determinations." 2012 WL 4328413, at *21 (footnote collecting cases from the Second, Third, Fifth, Sixth, Ninth, Tenth, and Eleventh Circuits). "Other courts, including other courts in this district, have declined to interpret *Nicola* as establishing a per se rule that any error at step two is a reversible error." *Lund*, 2014 WL 1153508, at *26 (citing cases); *see also Johnson*, 2012 WL 4328413, at *21.

This case is distinguishable from *Nicola* in at least two respects. First, borderline intellectual functioning is not at issue here. *See Lund*, 2014 WL 1153508, at *27; *Johnson*, 2012 WL 4328413, at *21. Second, unlike the claimant in *Nicola*, Plaintiff did not claim disability on the basis of chronic pain syndrome, the impairment she asserts was disregarded. *See* 480 F.3d at 886. Plaintiff included a number of spinal and mental impairments in her applications, but not chronic pain syndrome. Plaintiff did not identify chronic pain syndrome in her pre-hearing statement to the ALJ. (*See* Tr. 335-37.)

Plaintiff herself states that her "pain arises in large [sic] from severe cervical spine impairments, which necessitated surgical intervention of an anterior cervical discectomy at C5-C7." (Pl.'s Mem. in Supp. at 2.) Likewise, in her pre-hearing statement to the ALJ, Plaintiff similarly stated that her "subjective allegations of pain stem from objective, severe cervical spine impairments." (Tr. 335.) And, as Plaintiff herself recognizes, the ALJ found and concluded that cervical degenerative disc disease was one of Plaintiff's severe impairments.

The diagnosis and treatment of Plaintiff's chronic pain syndrome is not as straightforward as the diagnosis and treatment of her depression and cervical degenerative disk disease. Most often, Plaintiff's chronic pain syndrome was included as part of her past medical history rather than a present diagnosis. At the same time, treatment providers frequently described Plaintiff as having chronic pain in her neck. Additionally, while there are a couple of instances in which Plaintiff is diagnosed with chronic pain syndrome (such as, for example, by Dr. Vijayalakshmi), Plaintiff was also diagnosed with and treated for myofascial pain syndrome.

For purposes of these motions, the Court assumes without deciding that Plaintiff's chronic pain syndrome is a severe impairment that should have been identified at step two. Nevertheless, as will be discussed in greater detail below, the ALJ considered Plaintiff's pain and its alleged impact on her ability to function when assessing her residual functional capacity. Consistent with the prevailing view in this District, any potential error by the ALJ in not including Plaintiff's chronic pain syndrome as a severe impairment at step two was harmless based on the ALJ's consideration of the intensity, persistence, and functional effects of Plaintiff's pain when determining her residual functional capacity.

### C. Residual Functional Capacity

Plaintiff next argues that the ALJ erred by not considering her chronic pain syndrome in combination with her depression when determining her residual functional capacity. The residual-functional-capacity determination is "an assessment of what [Plaintiff] can and cannot do, not what he does and does not suffer from." *Mitchell v. Astrue*, 256 F. App'x 770, 772 (6th Cir. 2007); *see Martise v. Astrue*, 641 F.3d 909, 923 (8th Cir. 2011) (defining residual functional capacity as "the most a claimant can still do despite his or her physical or mental limitations" (quotation omitted)). A diagnosis alone is not sufficient. *See Perkins v. Astrue*, 648 F.3d 892, 899-900 (8th Cir. 2011); *Buckner v. Astrue*, 646 F.3d 549, 557 (8th Cir. 2011). The fact "[t]hat a claimant has medically-documented impairments does not perforce result in a finding of disability." *Stormo v. Barnhart*, 377 F.3d 801, 807 (8th Cir. 2004). Accordingly, the fact that the record contains evidence reflecting that Plaintiff has been diagnosed at one time or another with chronic pain syndrome does not by itself demonstrate that the ALJ erred in this case.

When assessing a claimant's residual functional capacity, the ALJ is required to take into account "limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" *Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims*, SSR 96–8p, 1996 WL 374184, at *5 (Soc. Sec. July 2, 1996) [hereinafter SSR 96–8p]; *see* 20 C.F.R. §§ 404.1545(a)(2) (considering all medically determinable impairments including those that are not "severe"), 416.945(a)(2). As such, a claimant's residual functional capacity represents "the most that she was capable of doing despite the combined effects of both her severe and non-severe medically determinable impairments." *Ford v. Astrue*, 518 F.3d 979, 981 (8th Cir. 2008). "It is appropriate for the ALJ to take a 'functional approach' when determining whether impairments amount to a disability." *See Stormo*, 377 F.3d at 807 (quoting *Bowen v. Yuckert*, 482 U.S. 137, 146 (1987)).

### 1. Consideration of Chronic Pain Syndrome and Depression in Combination

Plaintiff has not claimed that her chronic pain syndrome individually or in combination with her depression or any of her other impairments meets or equals a listed impairment. Rather, Plaintiff argues that "[n]owhere in the ALJ's residual functional capacity finding does the ALJ discuss the effect of [her] chronic pain syndrome on her depression or vice versa." (Pl.'s Mem. in Supp. at 6.) Yet, Plaintiff does not articulate what "effect" the ALJ should have discussed. While Plaintiff asserts that "the ALJ simply dismisse[d her] depression as 'mild' or 'moderate' in isolation," (Pl.'s Mem. in Supp. at 6), Plaintiff herself has not specifically identified any particular functional limitations

resulting from the combination of her chronic pain syndrome and depression that were not properly accounted for in the ALJ's residual-functional-capacity determination. Again, the fact that Plaintiff has been diagnosed with chronic pain syndrome and that her chronic pain syndrome constitutes a severe impairment (as the Court has assumed for purposes of the instant motions), does not perforce result in a finding of disability.

### 2. Weight Accorded to Dr. Stewart's Opinions

The thrust of Plaintiff's argument is that, by not appreciating the interaction between her chronic pain syndrome and her depression, the ALJ did not properly weigh the opinions of Dr. Stewart. Plaintiff argues that "it is apparent that Dr. Stewart's opinions . . . were made in consideration of the combined effects of [her] chronic pain syndrome and depression," (Pl.'s Mem. in Supp. at 7), and "Dr. Stewart makes clear in his opinions that it is not just [her] 'depressed mood,' but also her 'chronic pain' that leads to problems with concentration/focus," (Pl.'s Mem. in Supp. at 8).

In relevant part, the ALJ found and concluded that Plaintiff "is able to understand, remember and carry out simple tasks, make simple work-related decisions, and tolerate changes in a simple work setting." (Tr. 17.) Plaintiff is also "limited to occasional interaction with coworkers, supervisors, and the general public." (Tr. 17.)

Despite Plaintiff's assertion that Dr. Stewart's opinions were "exasperatedly dismisse[d]" by the ALJ, (Pl.'s Mem. in Supp. at 7), the ALJ in fact "accept[ed]" certain "findings" by Dr. Stewart "and g[a]ve[] them more weight." (Tr. 21.) Dr. Stewart opined that Plaintiff was not significantly limited in her abilities to carry out simple instructions, make simple work-related decisions, and respond appropriately to changes in the work

setting.  Dr. Stewart also opined that while Plaintiff had some limitations in her social functioning, including moderate limitations in her abilities to respond appropriately to supervisors and get along with coworkers, she was not significantly limited in her ability to get along with the public.  (*Compare* Tr. 539 *with* Tr. 725.)  These opinions are reflected in and consistent with the ALJ's residual-functional-capacity determination.

The ALJ did find and conclude, however, that certain portions of Dr. Stewart's opinions were inconsistent with his treatment notes and the record as a whole, and thus entitled to less weight.  The ALJ acknowledged that Dr. Stewart opined that Plaintiff "would likely be off task 25% of the day and miss four or more days per month, resulting in marked limitations in her ability to complete a normal workday or work week without interruptions," and that Plaintiff "is markedly limited in her ability to interact with supervisors and coworkers."[15]  (Tr. 21.)  The ALJ "considered these findings but g[a]ve[] them less weight," concluding they were "grossly inconsistent with the record as a whole, explicitly Dr. Stewart's own mental status examinations of [Plaintiff]."  (Tr. 22.)  The ALJ reasoned:

> In fact, during office visits, Dr. Stewart repeatedly describes [Plaintiff] as polite and cooperative, engaging well with good eye contact.  There is no indication that she reported any significant struggles getting along with others.  Further, Dr. Stewart also routinely describes [Plaintiff] as having only "mild" limitations and [Plaintiff's] treatment has not changed

---

[15] As best as this Court is able to tell, Dr. Stewart opined that Plaintiff had *moderate loss* or was *moderately limited* in her abilities to respond appropriately to supervisors and get along with coworkers, rather than *marked* limitations as stated by the ALJ.  (*See, e.g.*, Tr. 539 (moderate loss in abilities to accept instructions and respond appropriately to criticism from supervisors and get along with coworkers and peers), 725 (moderate limitations in her abilities to accept instructions and respond appropriately to criticism from supervisors and get along with coworkers and peers).)

since the alleged onset date suggesting good management of
her depression."

(Tr. 22.)  Accordingly, the ALJ concluded that these opinions are "inconsistent with the

evidence as a whole and are therefore given less weight."  (Tr.  22.)

There is no dispute that Dr. Stewart is an acceptable medical source who treated

Plaintiff.  *See* 20 C.F.R. §§ 404.1502(a)(1) (identifying licensed physicians as acceptable

medical sources), 416.902(a)(1) (same), 404.1527(a)(2) ("Treating source means your own

acceptable medical source who provides you, or has provided you, with medical treatment

or evaluation and who has, or has had, an ongoing treatment relationship with you."),

416.927(a)(2) (same).  A treating source's "opinion is entitled to controlling weight when

it is supported by medically acceptable techniques and is not inconsistent with substantial

evidence in the record." *Julin v. Colvin*, 826 F.3d 1082, 1088 (8th Cir. 2016); *accord Cline*

*v. Colvin*, 771 F.3d 1098, 1103 (8th Cir. 2014).

"Yet[, this controlling] weight is neither inherent nor automatic and does not obviate

the need to evaluate the record as a whole." *Cline*, 771 F.3d at 1103 (citation and quotation

omitted).  The opinions of treating physicians "are given less weight if they are inconsistent

with the record as a whole or if the conclusions consist of vague, conclusory statements

unsupported by medically acceptable data." *Stormo*, 377 F.3d at 806; *see Cline*, 771 F.3d

at 1103 (permitting the opinions of treating physicians to be discounted or disregarded

"where other medical assessments are supported by better or more thorough medical

evidence, or where a treating physician renders inconsistent opinions that undermine the

credibility of such opinions" (quotation omitted)).  When a treating source's opinion is not

given controlling weight, the opinion is weighed based on a number of factors, including the examining relationship, treatment relationship, opinion's supportability, opinion's consistency with the record as a whole, specialization of the provider, and any other factors tending to support or contradict the opinion. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Shontos v. Barnhart*, 328 F.3d 418, 426 (8th Cir. 2003). The ALJ is required to "give good reasons" for the weight assigned to a treating source's opinion. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Cline*, 771 F.3d at 1103.

Plaintiff takes issue with the ALJ's comparison of Dr. Stewart's opinions to his treatment notes, asserting such notes present only a partial picture. Plaintiff argues that

> Dr. Stewart's treatment notes speak largely to the nature of [her] depression, as one would expect when reading the notes of a treating mental health professional. However, as a medical doctor who was plainly aware of [her] medical history and diagnosis of chronic pain syndrome, Dr. Stewart is uniquely suited to opine upon the limitations arising from the combination of her physical and mental impairments.

(Pl.'s Mem. in Supp. at 7-8.) Plaintiff further argues that "[t]he mild limitations referenced on occasion by Dr. Stewart in his treatment notes, made in his capacity as [her] mental health professional, obviously refer to [her] mental health impairments alone, not the combined effects of her chronic pain and mental impairments he explicitly opined about in his opinions." (Pl.'s Reply at 3.) Plaintiff argues that "Dr. Stewart makes clear in his opinions that it is not just [her] 'depressed mood,' but also her 'chronic pain' that leads to 'problems with concentration/focus.'" (Pl.'s Mem. in Supp. at 8.)

It is well established that "an ALJ may discount a treating source opinion that is unsupported by treatment notes." *Aguiniga v. Colvin*, 833 F.3d 896, 902 (8th Cir. 2016);

*see, e.g.*, *Anderson v. Astrue*, 696 F.3d 790, 794 (8th Cir. 2012) (no error in "minimal weight" assigned to treating neurologist's opinion where "the significant limitations [neurologist] expressed in his evaluation are not reflected in any treatment notes or medical records"); *Martise*, 641 F.3d at 925 ("An ALJ may justifiably discount a treating physician's opinion when that opinion is inconsistent with the physician's clinical treatment notes." (quotation omitted)); *Davidson v. Astrue*, 578 F.3d 838, 843 (8th Cir. 2009) ("It is permissible for an ALJ to discount an opinion of a treating physician that is inconsistent with the physician's clinical treatment notes.").

While Dr. Stewart noted that Plaintiff was pursuing treatment to manage chronic pain, there is no discussion of chronic pain syndrome in his treatment notes or the interaction between Plaintiff's chronic pain syndrome and her depression. Plaintiff suggests this is because their sessions were focused on her mental health. Yet, when Dr. Stewart observed Plaintiff to be affected by pain, he noted it. In November 2015, Dr. Stewart observed that Plaintiff's positioning and body movements evidenced efforts to minimize pain. Yet, during the same session, Dr. Stewart also observed that Plaintiff maintained good eye contact and was engaged in the discussion. Thus, Plaintiff continued to maintain this level of functioning even when she was experiencing pain and exacerbations of her depression.

Accordingly, the ALJ did not err in giving less weight to those portions of Dr. Stewart's opinions that Plaintiff would be off task more than 25% of the time, absent from work four or more days per month, and markedly limited in her ability to get along with supervisors and coworkers when these limitations were undermined by Dr. Stewart's

treatment notes that Plaintiff was pleasant, cooperative, and engaged in their discussions. *See, e.g.*, *Aguiniga*, 833 F.3d at 902 (opinion of physician treating claimant's anxiety appropriately considered where "ALJ gave [physician's] opinions some weight where it was warranted, and discounted it when it was contradicted by a lack of evidence or was undermined by contrary evidence in the treatment notes"); *Anderson*, 696 F.3d at 794 (no err in giving less weight to opinion of treating physician where "the significant limitations [physician] expressed in his evaluation are not reflected in any treatment notes or medical records"); *Halverson*, 600 F.3d at 930 (treating psychiatrist's opinion properly discounted where "multiple mental status examinations, including examinations performed by [treating psychiatrist] revealed no abnormalities, and [claimant] was repeatedly noted to be alert and oriented with normal speech and thought processes").

Moreover, the ALJ properly considered Dr. Stewart's opinions in the context of the entire record. *See* 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4); *Bernard v. Colvin*, 774 F.3d 482, 487 (8th Cir. 2014) ("Since the ALJ must evaluate the record as a whole, the opinions of treating physicians do not automatically control."). When a treating physician opines that a claimant has greater limitations than the claimant "actually exhibits in her daily living, an ALJ need not ignore the inconsistency." *Anderson*, 696 F.3d at 794. And, an ALJ properly discounts the opinions of a treating physician when such opinions are "contradicted by or inconsistent with other evidence in the record." *Howe v. Astrue*, 499 F.3d 835, 841 (8th Cir. 2007); *accord Julin*, 826 F.3d at 1088 (opinions of treating physicians "may be given limited weight if they are . . . inconsistent with the record"). The ALJ found that these particular limitations were "inconsistent with the evidence as a

whole," and noted overall that Plaintiff "is able to engage in activities of daily living that are generally consistent with that of light unskilled work." (Tr. 22.) As relevant to Plaintiff's ability to concentrate, the ALJ noted that Plaintiff "is able to drive, prepare meals, shop in stores, watch a two-hour movie, and generally manage finances." (Tr. 16; *see* Tr. 21.) With respect to social functioning, the ALJ noted that Plaintiff "is able to shop in stores, attend her children's functions, and appear for medical appointments with no impact from her mental health impairments," and "is described throughout her medical records as being well engaged, polite and cooperative." (Tr. 16 (citations omitted); *see* Tr. 21.)

In sum, the ALJ did not dismiss Dr. Stewart's opinions regarding Plaintiff's mental limitations. As reflected in the ALJ's residual-functional-capacity determination, the ALJ gave more weight to certain portions of Dr. Stewart's opinions regarding Plaintiff's abilities to perform unskilled work and less weight to those portions that were not supported by his treatment notes and the evidence in the record as a whole. The ALJ gave good reasons for the weight assigned to Dr. Stewart's opinions, and the ALJ's treatment of Dr. Stewart's opinions is supported by substantial evidence in the record as a whole.

### 3. Subjective Complaints of Pain

Lastly, Plaintiff argues that the ALJ erred in assessing the "credibility" of her statements regarding her pain. Plaintiff argues that the ALJ assessed her "pain in isolation." (Pl.'s Mem. in Supp. at 8.) Plaintiff's argument is largely, if not entirely, based on her contention that the ALJ did not properly consider Dr. Stewart's opinion.

In determining a claimant's residual functional capacity, an ALJ takes into account subjective symptoms, such as pain, evaluating the intensity, persistence, and limiting effects of those symptoms. *Titles II and XVI: Evaluation of Symptoms in Disability Claims*, SSR 16-3p, 2017 WL 5180304, at *4 (Soc. Sec. Oct. 25, 2017) [hereinafter SSR 16-3p]; *see, e.g.*, *Bryant v. Colvin*, 861 F.3d 779, 782 (8th Cir. 2017) ("Part of the [residual-functional-capacity] determination includes an assessment of the claimant's credibility regarding subjective complaints.").

> In considering the intensity, persistence, and limiting effects of an individual's symptoms, [the ALJ] examine[s] the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record.

SSR 16-3p, 2017 WL 5180304, at *4. Such evaluation includes consideration of "(i) the claimant's daily activities; (ii) the duration, frequency, and intensity of the claimant's pain; (iii) precipitating and aggravating factors; (iv) the dosage, effectiveness, and side effects of medication; and (v) the claimant's functional restrictions." *Vance v. Berryhill*, 860 F.3d 1114, 1120 (8th Cir. 2017); *see* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); SSR 16-3p, 2017 WL 5180304, at *7-8.

"Credibility determinations are the province of the ALJ, and as long as good reasons and substantial evidence support the ALJ's evaluation of credibility, [courts] will defer to [the ALJ's] decision." *Julin*, 826 F.3d at 1086 (quotation omitted); *see Hensley v. Colvin*, 829 F.3d 926, 934 (8th Cir. 2016) ("defer[ring] to an ALJ's credibility finding as long as

the ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so" (quotation omitted)).

First, to the extent Plaintiff argues that her subjective complaints of pain were not properly considered based on Dr. Stewart's opinions, the Court has already determined that the ALJ's treatment of Dr. Stewart's opinions is supported by substantial evidence in the record as a whole. Therefore, while medical opinions like Dr. Stewart's are one consideration in evaluating the intensity, persistence, and limiting effects of Plaintiff's pain, such opinions are not the only consideration. *See* 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1); SSR 16-3p, 2017 WL 5180304, at *4-7

Second, the ALJ plainly did not consider Plaintiff's pain in "isolation." In finding and concluding that Plaintiff's pain was not as intense, persistent, and limiting as she alleged, the ALJ took into account the very factors contemplated by the regulations. The ALJ considered the objective medical evidence. *See* 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2). Discussing Plaintiff's treatment for neck pain, the ALJ reasoned that, while continued pain, tenderness, and tightness following her fusion surgery warranted some limitations, Plaintiff still demonstrated normal strength and sensation in her upper extremities. The ALJ similarly observed that "the generally normal examinations" with Dr. Stewart did not support that Plaintiff "would likely miss three or more days of work per month, be markedly limited in her ability to maintain attention, and/or be off tasks more than 10% during the day as proposed at the hearing by the representative." (Tr. 21.)

The ALJ also took into account Plaintiff's daily activities, determining that they did not support greater limitations. 20 C.F.R. §§ 404.1529(c)(3)(i), 416.929(c)(3)(i). Among

other things, the ALJ noted that Plaintiff prepares meals a few days per week, attends school functions for her children, completes "lighter household chores," assists in the care of a grandchild, reads, shops in stores, visits with family, watches movies on occasion, and is generally able to manage her finances.  (Tr. 21.)

In addition, the ALJ considered Plaintiff's course of treatment for both her physical and mental health.  *See* 20 C.F.R. §§ 404.1529(c)(3)(iv), (v), 416.929(c)(3)(iv), (v).  For example, the ALJ observed Plaintiff had "been advised of other available medications to treat her depression and even individual therapy if she felt it was needed" but she did "not engage in these treatment modalities," which suggested that Plaintiff "was generally content with her treatment."  (Tr. 20-21.)

Further, the ALJ also took into account Plaintiff's work history.  *See* 20 C.F.R. §§ 404.1529(c)(3)(vii), 416.929(c)(3)(vii).  A lengthy work history can support complaints of disabling pain.  *Black v. Apfel*, 143 F.3d 383, 387 (8th Cir. 1998).  The ALJ recognized that Plaintiff's "earning records reflect [she] has a positive work history as . . . she has yearly earnings above substantial gainful activity in the years prior to the alleged onset date," which "suggests good work motivation."  (Tr. 21.)  While "accept[ing] that [Plaintiff's] past job as an embroider[er] exacerbated her pain due to repetitive motions," the ALJ additionally pointed out, however, that "the record does not reflect that [Plaintiff] has ever attempted work that would fall within the residual functional capacity."  (Tr. 21 (citation omitted).)

Here, the ALJ provided good reasons for not finding Plaintiff's subjective complaints of pain as intense, persistent, and limiting as alleged.  The ALJ's discussion of

the objective medical evidence as well as Plaintiff's daily activities, course of treatment, and work history demonstrates that Plaintiff's subjective complaints of pain were considered within the proper framework and not in insolation. The ALJ's assessment of Plaintiff's subjective complaints of pain is supported by substantial evidence in the record as a whole.

## VII. ORDER

Based upon the record, memoranda, and the proceedings herein, **IT IS HEREBY ORDERED** that:

1.  Plaintiff's Motion for Summary Judgement (ECF No. 13) is **DENIED**.

2.  The Commissioner's Motion for Summary Judgment (ECF No. 15) is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: March___27___, 2019                    _____*s/ Tony N. Leung*_____
                                              Tony N. Leung
                                              United States Magistrate Judge
                                              District of Minnesota


                                              *Rosalind J. G.  v. Berryhill*
                                              Case No. 18-cv-82 (TNL)